STATE of Maine

v.

**Robert J. REILLY.**

Supreme Judicial Court of Maine.

Argued May 3, 1982.
Decided June 28, 1982.

David M. Cox, Dist. Atty., Gary F. Thorne, Asst. Dist. Atty. (orally), Bangor, for plaintiff.

Stern & Goldsmith by J. Hilary Billings (orally), Marshall A. Stern, Bangor, for defendant.

Before McKUSICK, C. J., and NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

ROBERTS, Justice.

Following a jury trial in Superior Court, Penobscot County, Robert J. Reilly was convicted of assault on an officer, 17–A M.R.S.A. § 752. On appeal he claims that (1) the prosecutor's final argument was improper and requires reversal, (2) the trial court erred when it excluded what he characterizes as a prior consistent statement, (3) the trial court should not have allowed the prosecutor to ask certain questions regarding the defendant's ingestion of drugs and (4) the trial court erred by refusing to give a proposed instruction. We conclude that, in the context of this case, the prosecutor's final argument requires us to vacate Reilly's conviction.

I.

A. *Officer Falvey's Testimony*

Two substantially different stories regarding the underlying facts were elicited at trial. Officer Timothy Falvey of the Bangor Police Department testified that on the morning of January 23, 1981, he saw a car drive by him in the middle of the road. He followed the car, which was driven by Reilly, through a number of streets. He testified the car was fishtailing and going "at quite a high rate of speed" for the conditions which were bad that night—the roads being snowy and icy. Falvey said that most of the time he followed the car he had his blue lights on as he was going to advise the driver to slow down. Reilly pulled into his driveway, Falvey pulled up behind him, got out of his police car and asked Reilly for his license and registration. Reilly asked Falvey why he had stopped him. Falvey told him he'd explain after he found out who Reilly was. Reilly gave Falvey his license and registration. Falvey then told Reilly that, given the conditions, Reilly should slow down. Falvey then went back to his car to run a license check on Reilly. After unsuccessfully attempting to check on Reilly's license, Falvey got out of

his car and told Reilly he wouldn't give him a ticket but that he should slow down in the future. At that point, Falvey testified, Reilly began to scream and yell at Falvey to the effect that "us fucking pigs were always harassing him." Falvey responded that "if that's the kind of attitude he wants to take, he still can receive a summons for his excessive speed on the street." Falvey started to walk back to his car to get his ticket book whereupon Reilly jumped him from behind and began to kick and choke him. Falvey called for help on his portable radio.

After Falvey punched Reilly a few times Reilly got off him. Falvey then told Reilly he was under arrest, grabbed his nightstick, ran after Reilly who was now standing at the rear of the police car, and at least twice hit Reilly across the side of his head with the nightstick. Falvey tried to grab Reilly to handcuff him but Reilly got up, ran onto the porch of his house, pushed Falvey away and ran inside. Another police car arrived with two officers. Falvey yelled at the two officers, smashed the glass in Reilly's outside door with his nightstick, opened up the inner door, went into the house and with the help of the other officers subdued Reilly. Falvey received eight stitches above his left eye as a result of this altercation. Photographs of Falvey, taken a few hours later, were admitted into evidence. He missed two days of work.

### B. *Reilly's Testimony*

Reilly's testimony differed substantially from that of Officer Falvey. Reilly testified that he was driving at twenty miles per hour, he was not in the middle of the road, he knew the police car was following him and that the police car's blue lights did not go on until it pulled up behind him at his driveway. Reilly said, "What's the problem officer?" Falvey told him to shut up and demanded his license and registration. Reilly gave him those and asked what he had done. Falvey told him that he was fishtailing. Reilly told him it was slippery and his car had a tendency to fishtail. Falvey went back to the police car, then returned with his nightstick in his hand,

pushed Reilly up against his car and told Reilly that "I was going to be a nice guy and give you a warning, but now I'm going to give you a ticket." Reilly told Falvey he had no right to touch him whereupon Falvey put his nightstick across Reilly's chest and told him he didn't have any rights. Falvey, followed by Reilly, "stormed" back to the cruiser saying he was going to write a ticket. When they arrived at the police car, Falvey lunged at Reilly, grabbed him by the tie and started to choke him. The two fell to the ground. Reilly eventually ended up on top of Falvey. Falvey called for help on his radio and asked Reilly to please let him up and they'd talk about it. When Reilly let Falvey go, Falvey stood up and hit Reilly with his nightstick on the top of his head and knocked him to the ground. Falvey hit Reilly at least four times with his nightstick while he was on the ground. Reilly couldn't remember exactly how many times he was hit as he lost consciousness for a short period of time. Reilly rolled away and ran to his house. Falvey caught him at the front door but Reilly pushed him away and ran inside. Falvey kicked down the door to Reilly's apartment and came inside followed by officers Demonico and Roach. Reilly was handcuffed in the bathroom of the apartment after which Falvey hit him a few more times in the head with his nightstick. The officers present then threw him onto the kitchen floor and kicked and hit him. Reilly testified that he was taken to the Bangor police station, taken into a room where an officer Demonico mashed his head into a table and choked him with a nightstick. Reilly was then beaten for twenty minutes to half an hour and finally told to strip. One officer cut his tie off with a pair of scissors. Demonico told Reilly to hurry up and jabbed him twice in the stomach with his nightstick. The police later took Reilly to a hospital for a blood test. Reilly testified that while at the hospital Demonico again hit him in the stomach with a nightstick. Photographs of Reilly after he had been treated were admitted into evidence. Reilly testified that as a result of the incident he had seen a doctor twenty-five or thirty times, he had a hard time

talking and swallowing as cartilage had been broken around his Adam's apple, he still had headaches, ringing sensations, pain in his ears and had been on medication for eight months as a result of the incident.

### C. Rebuttal Testimony

The State called Officers Roach, Demonico and Butler of the Bangor Police Department to rebut the defense testimony. They essentially testified that they did not see or hear anyone beat the defendant at any time.

Later, in surrebuttal, Reilly testified that it was not Demonico who hit him in the stomach at the hospital or choked him at the police station, but rather Officer Butler (whom Reilly had recognized when he testified in rebuttal on behalf of the State).

### II.

In his closing rebuttal argument the district attorney told the jury that defense counsel in his closing argument had conceded that the police were telling the truth. Defense counsel had not done so. The State then told the jury that defense counsel knew the police were telling the truth. Later, relying on the fact that Reilly had changed his testimony regarding the identity of the officer he claimed had assaulted him at the police station and hospital, the prosecutor said Reilly was "so reckless that he doesn't mind going around damaging people's careers." Finally, regarding Reilly's many visits to see doctors the district attorney said:

> What kind of an attempt is that? That's just an attempt to exaggerate the facts. That's what that man is doing. He doesn't know what an oath means. He has no conception of that, none at all. And, yet, Defense Counsel never told us about how you reconcile Mr. Reilly's statement with Mr. Demonico and Mr. Cammack. They didn't even dare do anything, didn't even try, because they knew Mr. Reilly was a liar.

Defense counsel did not object to this argument.

With dismaying frequency we have been called upon to determine the propriety of prosecutorial tactics. *See State v. Ledger,* Me., 444 A.2d 404, 409–11 (1982); *State v. Terrio,* Me., 442 A.2d 537, 543 (1982); *State v. Collin,* Me., 441 A.2d 693, 696–97 (1982); *State v. Simmons,* Me., 435 A.2d 1090, 1093–94 (1981); *State v. Connor,* Me., 434 A.2d 509, 511–12 (1981); *State v. Gaudette,* Me., 431 A.2d 31, 32–34 (1981); *State v. Vigue,* Me., 420 A.2d 242, 246–47 (1980); *State v. Thurlow,* Me., 414 A.2d 1241, 1243–45 (1980); *State v. Flood,* Me., 408 A.2d 1295, 1297–99 (1979); *State v. Dana,* Me., 406 A.2d 83, 86–88 (1979). Even more disconcerting are the number of occasions we have determined that prosecutorial tactics used in the trial below were improper. *See Ledger,* 444 A.2d at 411; *Terrio,* 442 A.2d at 543; *Collin,* 441 A.2d at 697; *Gaudette,* 431 A.2d at 34; *Vigue,* 420 A.2d at 247; *Thurlow,* 414 A.2d at 1244; *Flood,* 408 A.2d at 1298–99; *Dana,* 406 A.2d at 88.

■ The prosecutor's duty "to see that the accused has a fair trial [as well as the duty] to bring about a just conviction of the guilty," *State v. Wyman,* Me., 270 A.2d 460, 463 (1970), should, by now, be well known to the prosecutorial bar. *See Ledger,* 444 A.2d at 411. We have repeatedly emphasized that "while a prosecutor 'may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" *Collin,* 441 A.2d at 697 (*quoting Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935)). *See also Gaudette,* 431 A.2d at 34; *Dana,* 406 A.2d at 88; *Wyman,* 270 A.2d at 463.

■ We have previously acknowledged the prosecutor's ability to "employ wit, satire, invective, and imaginative illustration. . . ." *Conner,* 434 A.2d at 512 (*quoting State v. Martel,* 103 Me. 63, 66, 68 A. 454, 455 (1907)). This license, however, is strictly confined to the domain of facts in evidence. *Conner,* 434 A.2d at 512; *Martel,* 103 Me. at 66, 68 A. at 455.

■ Here, despite the State's unwillingness to so concede at oral argument, we

think it obvious that the prosecutor's closing remarks constitute an example of prosecutorial overkill. As related in Part I, *supra*, the trial below was essentially a trial of credibility. The prosecutor here claimed defense counsel knew and had conceded the police were telling the truth. The logical import of that remark would require a conclusion that defense counsel knew that the defendant was not telling the truth. The statement was followed by the prosecutor's further argument that defense counsel didn't "dare" do anything to reconcile the testimony "because they knew Mr. Reilly was a liar." This remark was particularly damaging inasmuch as the jury would presume that defense counsel were in a position to know the true facts of the case. Not only did this argument go beyond any facts in evidence but it also accused defense counsel of knowledge of Reilly's untruthfulness and of "mislead[ing] the judge, jury, or tribunal by . . . artifice or false statement" which may constitute improper conduct under M.Bar R. 3.7(e).[1]

■ In point of fact, it was the prosecutor's conduct itself which violated M.Bar R. 3.7(e). The obvious purpose of the rule, at least in part, is to prevent the injection of misleading, irrelevant or inadmissible matters during the course of a trial. The prosecutor surely knew that the personal thoughts and beliefs of defense counsel were totally irrelevant and not a matter for jury consideration. The improper presentation of an irrelevant issue such as this could only serve to mislead the jury and interfere with the jury's proper role of the determination of the defendant's guilt or innocence. In addition, because the rule specifically prohibits any assertion of his own personal knowledge or opinion, the prosecutor ought to have known that he could not properly comment upon the personal knowledge or opinion of defense counsel. These matters simply are not proper subjects for jury speculation.

We have heretofore commented that "[t]he line between proper and improper behavior 'can only be located through a sense of fitness and taste and an appreciation of the prosecutor's proper role. Those who cannot, discern that line with confidence had best stay a safe distance away from it.'" *Collin*, 441 A.2d at 697 (*quoting United States v. Spain*, 536 F.2d 170, 175–76 (7th Cir. 1976)). Regrettably, the prosecutor in the trial below not only failed to confidently demark the boundary between proper and improper conduct, in so failing he clearly stepped across it.

■ We do not suggest that attribution to defense counsel of knowledge of a defendant's untruthfulness would *per se* and in all instances require a new trial. Prompt and appropriate curative instructions, under some circumstances, may well alleviate the damage caused by such conduct. Here, however, the instructions to the jury concerning the final arguments were neither prompt nor specifically addressed to the prosecutor's misconduct.[2] Furthermore, as

---

1. M.Bar. R. 3.7(e) provides, *inter alia*, as follows:

 (1) In appearing in his professional capacity before a tribunal, a lawyer shall:

 (i) Employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and shall not seek to mislead the judge, jury, or tribunal by any artifice or false statement of fact or law;
 . . . .

 (2) In appearing in his professional capacity before a tribunal, a lawyer shall not:
 . . . .

 (ii) State or allude to *any matter* that he has no reasonable basis to believe is relevant to the case or will not be supported by admissible evidence;
 . . . .

 (iv) *Assert his personal knowledge* of the facts at issue, except when testifying as a witness;

 (v) *Assert his personal opinion* as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated therein. . . .

(Emphasis added.)

2. Although we focus upon that part of the argument involving the asserted beliefs of defense counsel, we do not condone the use of pejoratives such as "liar." Indeed, when necessary, a trial judge in the exercise of his responsibility to establish and maintain civilized

we noted above, the trial below was essentially a trial of credibility. This is not a case in which the evidence against the defendant may be characterized as "overwhelming." The prosecutor's improper comments went directly to credibility—the principal underlying issue at trial. Given these circumstances, we have no choice but to vacate the conviction. Although we vacate the conviction on the grounds set forth above, we proceed, nevertheless, to address other issues Reilly raises for the guidance of the court and counsel in the event of a new trial.

## III.

 At trial the State called Richard Lyles who lived across the street and who had observed a portion of the incident between Reilly and the police. The morning after the incident Lyles spoke with Reilly and his wife. Later, he made some notes of what he had observed the night before. Approximately two weeks after the incident Lyles, with the help of the notes he had made, gave a written statement to the Bangor Police Department.

At trial, Lyles testified regarding what he had seen transpire on the morning of January 23, 1982. On redirect examination by the State, Lyles admitted that he had spoken with Reilly and his wife the morning after the incident—before he made his notes and before he gave the written statement to the police. Thereafter, defense counsel sought to have the written statement Lyles had made to the police admitted into evidence. He argued that the State had attacked Lyles' testimony with an implied charge of improper influence. The trial court excluded Lyles' written statement.

Reilly now argues that M.R.Evid. 801(d)(1) specifically authorizes the admission of Lyles' statement as a prior consistent statement to rebut a charge of improper influence. M.R.Evid. 801(d)(1) provides in part: "A prior consistent statement by the declarant whether or not under oath, is

admissible only to rebut an express or implied charge against him of recent fabrication or improper influence or motive." Here, defense counsel claims that the charge of improper influence was made by the State when it elicited evidence of the conversation witness Lyles had with defendant Reilly and his wife the morning after Reilly was arrested. The evidence the defense sought to admit in rebuttal was a statement Lyles gave to the police two weeks after the incident *and* two weeks *after* Lyles was allegedly subjected to improper influence.

Under M.R.Evid. 801(d)(1) the prior consistent statement may be "admitted *only* to rebut an express or implied charge of recent fabrication or improper influence or motive." *State v. Rolls*, Me., 389 A.2d 824, 828 (1978) (emphasis in original). "The rationale for this rule is that it allows the trier of fact to consider a statement made *prior* to the time any improper motive may have arisen, as bearing on the credibility of the testimony given in court." *Id.* (emphasis added); *see McCormick on Evidence*, §§ 49, 251 (2d ed. 1972). Evidence offered under this rationale, however, must have some probative value to rebut the charge of recent fabrication or improper influence or motive. *State v. True*, Me., 438 A.2d 460, 466 (1981); *see United States v. McPartlin*, 595 F.2d 1321, 1351 (7th Cir. 1979). Here, the statement offered by the defense was made by Lyles *after* the alleged improper influence took place. Because the improper influence, if any, would have affected not only Lyles' trial testimony, but also the statement which Lyles gave to the police, under the rationale of Rule 801(d)(1) the statement had no probative value to rebut the charge of improper influence Reilly claims was made by the State. *See United States v. Guevara*, 598 F.2d 1094, 1100 (7th Cir. 1979); *McPartlin*, 595 F.2d at 1351. It follows that the Superior Court correctly excluded the statement.

standards, *see McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819,

824 (1943), may properly prohibit such a characterization of a witness.

## IV.

Following his arrest Reilly consented to a blood test. On behalf of the State an expert conducted an analysis of Reilly's blood which apparently indicated that Reilly had traces of ephedrine and phencyclidine in his blood at the time of his encounter with Falvey. Before trial Reilly filed a motion in limine to exclude the results of this test on the ground that the defense had no opportunity to conduct its own blood analysis because the sample had been entirely consumed during the State's analysis. The Superior Court's denial of Reilly's motion on this ground was not error. We note, however, that *at trial* when Reilly renewed his motion the Court *did* exclude the blood test results on the ground that the results were admittedly speculative and that they lacked the requisite probative value to be admitted into evidence. The principal thrust of Reilly's argument, therefore, goes not to the admissibility of the results, but rather, goes to questions asked of defense witnesses by the district attorney which related to Reilly's possible ingestion of drugs.

The defense called David Dixon who was with Reilly during the evening of January 22. On direct examination defense counsel asked Dixon whether Reilly had been drinking that night and whether he had been under the influence of alcohol. Dixon replied Reilly had probably consumed two beers and he did not know if Reilly was under the influence of alcohol. Thereafter, during cross examination the State asked Dixon whether Reilly had any other kind of intoxicants and whether he consumed anything containing ephedrine. Dixon answered "not to my knowledge." Defense counsel objected. At sidebar defense counsel said "We would renew our motion [in limine], if there is any intention of bringing any further evidence of any kind of blood sample. . . ." The Court said, "The only thing in front of me right now is . . . whether [the witness] knew whether [the defendant] had taken any particular amphetamine. Are you objecting to that question?" Defense counsel said *no* he was not. The State also inquired of Dixon whether he knew if Reilly had consumed any counterfeit speed that evening. Dixon replied Reilly had not. There was no objection.

During cross examination of Reilly the district attorney asked him "Did you ever have any counterfeit speed or anything like that?" and "Did you ever consume anything like phencyclidine?" Defense counsel also did not object to those questions.

Although inadmissible, the test results may have provided the prosecutor with a good faith basis for inquiring of the witnesses whether Reilly had consumed drugs which might have impaired his observations, perceptions and memory of the incident. Despite this possible foundation, given the circumstances of this case we need not here decide the propriety of the questions asked by the prosecutor. Defense counsel specifically told the court he was *not* objecting to the questions the prosecutor asked of Dixon and did not object to the questions asked of Reilly. As a result, we do not have before us any ruling by the trial court. We are aware that, notwithstanding a proper foundation, questions relating to the illegal use of drugs carry an inherent danger of prejudice and require the trial court to carefully weigh the probative value of such testimony in accordance with M.R.Evid. 403. We caution counsel to seek a specific ruling in such circumstances in order to properly preserve the issue for appellate review.

## V.

In the event that the issue may arise again upon retrial, we comment briefly upon Reilly's argument that the trial court erred when it refused to give an instruction proposed by the defense which specifically related to police testimony. The proposed instruction was in accordance with the settled law of this jurisdiction. *See State v. Gribbin*, Me., 360 A.2d 517 (1976). Although such an instruction would not have been inappropriate, here the experienced and able trial justice conscientiously instructed the jury in a general manner as to witness credibility. We cannot say that

**1132**

the justice below abused his discretion by instructing the jury without a specific reference to the credibility of police officers.

The entry is:

Judgment vacated.

All concurring.