**STATE of Maine**

v.

**Nancy A. FREDETTE.**

Supreme Judicial Court of Maine.

Argued Nov. 13, 1981.

Reargued Jan. 7, 1983.

Decided June 28, 1983.

James E. Tierney, Atty. Gen., William R. Stokes (orally), Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for plaintiff.

Glassman, Beagle & Ridge, Caroline Glassman (orally), C. Alan Beagle, Cloutier & Woodman, James F. Cloutier, Portland, for defendant.

Before McKUSICK, C.J., GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE, and WATHEN, JJ., and DUFRESNE, A.R.J.

VIOLETTE, Justice.

Defendant, Nancy A. Fredette, appeals from a judgment convicting her of murder, 17–A M.R.S.A. § 201 (1983), after a jury trial in Superior Court (Lincoln County). She contends, among other things, that the trial justice committed prejudicial error by admitting hearsay testimony from three prosecution witnesses. We agree and remand for a new trial.

About 7:15 a.m. on May 26, 1978, Frederick Fredette was shot several times in the bedroom of his dwelling in Biddeford, Maine. He died the following day as a result of those gunshot wounds. At the time of the shooting, his wife and five of their six children were also present in the house. All of them were in bed except for Mrs. Fredette when the shots were fired. She testified that she was in the bathroom at that time. After hearing the shots, she claimed that she could not immediately get out of the bathroom because the door was somehow jammed. While stuck in the bathroom, she heard someone run through the kitchen and out the side door of the house. She was not able to see this person. She told the police essentially this same story, then became a prime suspect based on the police investigation following the murder. In September of 1978, a York County Grand Jury indicted Mrs. Fredette for the murder of her husband. Her first trial commenced on December 3, 1979, in Superior Court (Somerset County). This trial ended in a mistrial on December 20, 1979, because the jury was unable to reach a unanimous verdict. Her retrial commenced on June 9, 1980, in Superior Court (Lincoln County) and she was found guilty as charged. She then appealed to this Court.

## I. Double Jeopardy

At the outset, defendant raises a threshold issue that the retrial violated her right to be free from double jeopardy under Art. I, § 8 of the Maine Constitution and the fifth amendment of the United States Constitution.[1] After approximately ten hours of deliberation, the jury sent the trial justice a note that they could not reach a unanimous decision. Rather than declaring a mistrial on that basis, he met with counsel for both sides in his chambers and sought their views. Approximately one hour later, after consulting with counsel and contacting the jury through notes, he once again instructed the jury in open court as to the procedure to arrive at a verdict. After the jury deliberated approximately three more hours, the trial justice informed counsel that he would ask the jury in open court whether there was any reasonable probability that a verdict could be reached on further deliberations. The trial court also informed counsel that he would excuse the jury if he found they were still deadlocked; defense counsel made no objection. The jury was thereupon returned to the courtroom and the foreman informed the court, in the presence of all jurors and counsel, that the jury was unable to reach a verdict and that there was no reasonable probability of reaching one upon further delibera-

---

1. In *State v. Howes*, 432 A.2d 419, 423 (Me. 1981), we interpreted the double jeopardy clause of the Maine Constitution, Me. Const. art. I, § 8, to afford essentially the same protection as that guaranteed by the fifth amendment of the United States Constitution.

**20**

tions. The trial justice then excused the jury. Defendant again did not object.

■ Although defense counsel did not move for a mistrial, the record makes clear that the defendant did consent to the mistrial. The trial justice sought the views of defense counsel, and defense counsel actively participated in the decision whether to grant a mistrial. At the point when the trial justice decided he would discharge the jury if they felt they could not reach a verdict, he made this known to defense counsel who offered no objection. Accordingly, we hold that defendant consented to the discharge of the jury and she, therefore, cannot now raise the bar of double jeopardy. *State v. McConvey,* 459 A.2d 562, 565 n. 2 (Me.1983); *State v. Linscott,* 416 A.2d 255, 260 n. 7 (Me.1980); *State v. Small,* 381 A.2d 1130, 1132 n. 3 (Me.1978). Assuming *arguendo* that defense counsel's silence did not manifest consent, we conclude that the trial justice did not abuse his discretion in declaring a mistrial and that there was "manifest necessity" for the mistrial. *See State v. Henderson,* 435 A.2d 1106 (Me. 1981); *Cf. State v. Linscott,* 416 A.2d 255 (No manifest necessity where jury was deliberating less than two hours, the court received only a single communication indicating an inability to arrive at unanimous verdict and defense counsel was given no opportunity to participate in decision whether to grant a mistrial).

II. *Testimony Admitted as Prior Consistent Statements or Statements Against Interest*

At defendant's second trial, Gerard (Gus) Laverriere, a witness for the State, was declared unavailable and his entire testimony given at the first trial was admitted into evidence.[2] At that first trial, Laverriere testified as follows on direct examination.

Sometime in January of 1977, Mr. Fredette asked him to appraise his fire damaged home. Mr. Fredette promised to pay him $5,000 on the condition that he would receive approximately $75,000 from his insurance company as a result of the appraisal. Although Laverriere performed the appraisal and the Fredettes received about $73,500, he was never paid by Fred Fredette. Laverriere then testified to a meeting that he had with Mrs. Fredette in October of 1977. He walked into a cafe that he frequented in Biddeford and saw Mrs. Fredette sitting at a table. He sat at the counter and placed an order. Sometime thereafter Mrs. Fredette asked if she could speak with him in private. After he finished eating, he left the cafe and Mrs. Fredette followed. They got into her car and drove towards the Saco-Old Orchard Beach area. At some point during their travels, Mrs. Fredette offered him $3,500 to find someone to kill her husband; he accepted the offer, never intending to fulfill his promise. She agreed to give him the money on the following Saturday (three or four days later). Prior to receiving the money on Saturday, he testified that he told, among others, Archie Droggitis, Anthony Frenette and Herschel Lerman about his conversation with Mrs. Fredette. On that Saturday, he testified that Mrs. Fredette gave him the $3,500 and requested that he find somebody to kill her husband.

Before the cross-examination of Laverriere was read into evidence at the second trial, counsel for both sides met with the trial justice in chambers to discuss defense counsel's objections to reading the entire cross-examination into evidence. During the cross-examination at the first trial, defense counsel impeached Laverriere's direct testimony by establishing that he told the police in June of 1978 and subsequently

---

2. We find no error in the justice's ruling that Laverriere was unavailable to testify due to illness as provided by M.R.Evid. 804(a)(4), and we reject defendant's claim that the use of the prior testimony violated her rights under the confrontation clauses of the Maine and United States Constitutions. Me. Const. art. I, § 6; U.S. Const. amend VI; *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *Cf. State v. Scholz,* 432 A.2d 763 (Me.1981); *State v. Smith,* 415 A.2d 570 (Me.1980); *State v. Rich,* 395 A.2d 1123 (Me.1978).

testified before the grand jury that his meeting with Mrs. Fredette occurred in November of 1977. At the first trial, the trial justice ruled that, pursuant to M.R.Evid. 801(d)(1),[3] these witnesses could testify to prior consistent statements made by Laverriere to rebut a charge of recent fabrication arising from defense counsel's attack on the inconsistent dates. Defense counsel sought a ruling whether the trial justice would allow Droggitis, Lerman and Frenette to testify to Laverriere's prior statements if defendant deleted this portion of the cross-examination.

The trial justice first ruled that, notwithstanding his prior ruling, the statements would also be admissible to rebut the impending charge that Laverriere had an improper motive. His reasons for this ruling are not entirely clear. He seemingly accepted the State's argument that the cross-examination would imply Laverriere had a motive to point the finger at Mrs. Fredette to avoid taking the blame for Mr. Fredette's murder. Therefore, because these statements were made prior to the murder, he concluded that they were admissible to rebut the charge of improper motive. He alternatively ruled that the statements made by Laverriere to Frenette, Lerman and Droggitis were admissible as statements against interest pursuant to M.R. Evid. 804(b)(3). Subsequently, over defendant's objections in each case, Frenette, Lerman and Droggitis were allowed to testify in the State's case in chief to statements by Laverriere concerning his meeting with Mrs. Fredette and her solicitation that he find somebody to kill her husband. On appeal, defendant claims the trial justice erred by allowing these witnesses to testify to those statements by Laverriere.

**3.** M.R.Evid. 801(d)(1) in relevant part provides: "A prior consistent statement by the declarant whether or not under oath, is admissible only to rebut an express or implied charge against him of recent fabrication or improper influence or motive."

**4.** M.R.Evid. 804(b)(3) provides in relevant part: (3) *Statement against interest.* A statement which was at the time of its making so

### a. *Statements against Interest*[4]

The trial justice did not clearly state his basis for admitting these statements as statements against Laverriere's penal interest. He seemingly ruled that the statements would tend to subject Laverriere to a charge of theft by deception, 17–A M.R.S.A. § 354 (1983), because Laverriere told Frenette, Lerman and Droggitis that he would take the money from Mrs. Fredette without intending to fulfill his promise to find someone to kill her husband if Mrs. Fredette came up with the money. In the circumstances of this case, we conclude that the trial justice erroneously admitted these statements as statements against penal interest.

To be admissible under Rule 804(b)(3), the statement must be against interest at the time it is made. *Jolicoeur v. Kennebec Water District,* 356 A.2d 193, 195 (Me.1976); Field & Murray, *Maine Evidence* § 804.4, at 240 (1976); *See also Merritt v. Chonowski,* 58 Ill.App.3d 192, 15 Ill.Dec. 588, 373 N.E.2d 1060 (1978); *State v. Haywood,* 295 N.C. 709, 728–30, 249 S.E.2d 429, 441–42 (1978) (addressing this requirement in context of declarations against penal interest offered to exculpate defendant); 5 Wigmore, *Evidence* § 1466, at 342 (Chadbourn rev. 1974). Whether or not a statement is against interest depends on the surrounding circumstances at the time the statement was made. *United States v. McClendon,* 454 F.Supp. 960 (W.D.Pa.1978); *McCormick on Evidence* § 279(b), at 676 (E. Cleary 2d ed. 1972). In the circumstances of this case, Laverriere's statements could not be considered declarations against penal interest because they did not tend to sub-

far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another or to make him an object of hatred, ridicule, or disgrace, *that a reasonable man in his position would not have made the statement unless he believed it to be true* ....

ject him to a charge of theft by deception, or any other criminal charge, at the time they were made. Here, Mrs. Fredette purportedly came to Laverriere and offered him $3,500 to find someone to kill her husband. Laverriere did not take any money from her at the initial meeting, but rather they agreed that she would get the money by that Saturday. After that first meeting, but before Mrs. Fredette met with him again to pay him the money, Laverriere told Frenette, Lerman and Droggitis about Mrs. Fredette's offer and that if she came up with the money, he would take the money as part payment for the money he considered the Fredettes owed him and not fulfill his promise to find someone to kill Mr. Fredette. In fact, he asked his attorney, Herschel Lerman, whether he could accept the money from Mrs. Fredette and his attorney told him that he could do so. Having made these statements before taking the money from Mrs. Fredette, Laverriere could not be subject to a charge of theft by deception when he made these statements. At most, Laverriere's statements reflect an intent to possibly commit a crime. Because one cannot be charged solely with an intent to commit a crime without anything more,[5] Laverriere's statements to Frenette, Lerman and Droggitis cannot be considered statements against penal interest at the time they were made.

■ The trial justice ruled that Laverriere's statements to Frenette, Lerman and Droggitis would also tend to subject Laverriere to civil liability for defamation or make him the object of hatred, ridicule or disgrace. We think that these rulings are also erroneous. In a simplified sense liability for defamation, in this case slander, turns on whether the statement tends, or is reasonably calculated, to cause harm to another's reputation. Of course, generally speaking, truth is a complete defense to an action for slander. *Picard v. Brennan*, 307 A.2d 833 (Me.1973). Therefore, one would tend to be subject to liability for defamation only if he was spreading lies. In light of this, it is apparent that this basis for admitting Laverriere's statements completely misses the purpose of admitting statements against interest. The purpose underlying this exception to the hearsay rule is that "a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect". 5 Wigmore, *supra*, § 1427, at 329. It is irrelevant whether the statement of fact could tend to create liability; it is the *fact* stated which must be against interest. *In Re Weber*, 11 Cal.3d 703, 523 P.2d 229, 114 Cal.Rptr. 429 (1974); 5 Wigmore, *supra*, § 1462, at 337. The only way Laverriere's statements would tend to be defamatory is if they were false or suspect. Therefore, to allow defamatory statements into evidence under this exception would conflict with the purpose that statements against interest are regarded as true because a person would not lie about such matters. Finally, there is simply nothing in the record to support a conclusion that Laverriere's statements would make him the object of hatred, ridicule or disgrace.

### (b) *Prior Consistent Statements*

The crucial issue before us in this case is whether the trial justice properly admitted under M.R.Evid. 801(d)(1) ("prior consistent statements") the testimony by Frenette, Lerman and Droggitis that Laverriere told them in October of 1977 about a meeting he had with Mrs. Fredette when she offered him money to find someone to kill her husband. Only recently, this Court once again delimited the scope of Rule 801(d)(1). *State v. Zinck*, 457 A.2d 422 (Me.1983). In that case, as in prior cases, we made clear that the proponent of the prior consistent statements must show three things: (1) that the

---

5. Attempt to commit a crime requires more than intent. 17–A M.R.S.A. § 152(1) (1983) provides in part: "A person is guilty of criminal attempt if, acting with the kind of culpability required for the commission of the crime, and with intent to complete the commission of the crime, he engages in conduct which, in fact, constitutes a substantial step towards its commission."

prior statement is consistent with the in-court testimony of the witness; (2) that the statement is being offered to rebut an express or implied charge of recent fabrication or improper influence or motive; and (3) that the statement was made prior to the time the supposed motive to falsify arose. *State v. Zinck,* 457 A.2d at 425; *State v. Reilly,* 446 A.2d 1125, 1130 (Me. 1982); *State v. True,* 438 A.2d 460, 465 (Me.1981). The narrow purpose underlying this rule is to allow "the trier of fact to consider a statement made prior to the time any improper motive may have arisen, as bearing on the credibility of the testimony given in court." *State v. Rolls,* 389 A.2d 824, 828 (Me.1978). "The scope of admissible pretrial statements 'turns upon the nature and extent of the impeachment efforts, and must be measured by the trial court's discretion.'" *State v. True,* 438 A.2d at 465 (*quoting State v. Lizotte,* 249 A.2d 874, 880 (Me.1969)).

■ Defense counsel's cross-examination of Laverriere established or tended to establish the following: (1) that Laverriere had hated the Fredettes since sometime shortly after January of 1977 because Fred Fredette never paid him the $5,000 for the appraisal; (2) that he knew the Fredettes had a gun collection; (3) that he lived with the Fredettes at a time when Mr. Fredette had the gun collection;[6] (4) that he knew how to shoot a gun; (5) that prior to the murder, he told several people that Mrs. Fredette offered him money to find someone to kill her husband, but he never told the police; (6) that he did not approach Mr. Fredette to warn him that his wife was looking for someone to kill him, even though he had seen him on the streets of Biddeford; and (7) that his trial testimony established dates of the meetings with Mrs.

Fredette that were inconsistent with his prior testimony before the grand jury and prior statements to the police.[7] This cross-examination created the possible inference that Laverriere's trial testimony arose from an improper motive, namely, to avoid criminal liability for the death of Fred Fredette. The key question is whether the prior consistent statements operate to rebut the implication that Laverriere fabricated his trial testimony to exculpate himself. If defense counsel's cross-examination or other evidence implied that Laverriere's motive to lie arose sometime after he made the prior consistent statements, then the prior statements would be admissible to rebut the charge of improper motive. However, a prior consistent statement does not rebut a charge of improper motive where the motive to falsify also existed at the time of the earlier statement. *State v. Zinck,* 457 A.2d at 425; *State v. True,* 438 A.2d at 466; *see also United States v. Guevara,* 598 F.2d 1094, 1100 (7th Cir.1979); *United States v. McPartlin,* 595 F.2d 1321, 1351 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Quinto,* 582 F.2d 224, 232–34 (2d Cir.1978).

On appeal, defendant argues that the cross-examination implied that Laverriere's motive to lie arose out of his long standing hatred for the Fredettes because Mr. Fredette never paid him the money for the appraisal. Defendant alternatively contends that, to the extent the cross-examination implied that Laverriere had a motive to kill Fred Fredette and possibly did, that motive arose out of the same incident and his motive to lie and point the finger at Mrs. Fredette remained the same in October of 1977 as it did at trial. In effect, defendant argues that the cross-examination suggests only that Laverriere framed

---

**6.** The State attempted to prove at trial that the murder weapon was a gun owned by the Fredettes.

**7.** On the facts of this case, it would have been error for the trial justice to have based the admissibility of the prior consistent statements solely on the fact that the cross-examination established an inconsistency in dates. We

have previously stated that an implied charge of recent fabrication does not arise every time a witness's testimony is contradicted. *State v. Zinck,* 457 A.2d at 425–26. Here, the witness gave essentially the same story with different dates. This did not rise to the level of a charge of recent fabrication.

defendant prior to the murder and, therefore, Laverriere had the same motive to lie in October of 1977 as he did when he testified. We agree with defendant that the cross-examination and other evidence suggested that Laverriere had a motive to kill Fred Fredette and that he made the statements as part of a plan to inculpate Mrs. Fredette. However, we must search the record to determine whether any additional implied charge fairly arose from the cross examination of Laverriere or other evidence. If another implied charge did fairly arise, then the prior consistent statements may operate to rebut that charge even if counsel did not intend to make such a charge. *State v. Zinck,* 457 A.2d at 426; *United States v. Baron,* 602 F.2d 1248, 1253 (7th Cir.), *cert. denied,* 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979).

The State takes the position that defendant's cross-examination of Laverriere in conjunction with the cross-examination of Detective J.P. Morin and Chief of Police Albert Morin implied that Laverriere had a motive to kill Fredette and that he did do so.[8] Therefore, the State contends this implied Laverriere had a motive to lie only after Fred Fredette was murdered and these statements were admissible because they were made prior to Fredette's murder.

▇ The State's position in this case overlooks that prior consistent statements are admissible only to rebut the implied charges of improper motive that fairly arise out of defendant's cross-examination of Laverriere or other evidence. In other words, the prior consistent statements at issue may very well rebut any suggestion that Laverriere concocted this story when he spoke with the police in June of 1978 in order to avoid suspicion, but they would not be admissible unless defendant's cross-examination and other evidence suggested that possibility. *State v. Zinck,* 457 A.2d at 426. Defense counsel's cross-examination of Laverriere did not suggest that Laverriere implicated Mrs. Fredette after he became a possible suspect,[9] nor was there any suggestion that Laverriere first concocted the story in June of 1978 when he spoke

8. On cross-examination, defense counsel asked these witnesses whether Norman Laverriere, a former Police Commissioner of Biddeford, was possibly related to Gerard Laverriere. The State argues that this line of questioning implied that Gerard Laverriere was related to a Police Commissioner who would have had access to the gun permit applications filed by Mr. and Mrs. Fredette. One application was signed by defendant and the State attempted to prove this gun was the murder weapon. The State contended that this implied Gerard Laverriere was the murderer and that he had a motive and plan to frame Mrs. Fredette. Although the State does not seem to grasp the point, it is significant that this plan to frame Mrs. Fredette would have arisen before the murder and defense counsel's cross-examination of Laverriere suggested that the statements to Lerman, Frenette and Droggitis were part of this plan.

The State also points to the testimony of Charles Cyr, Raymond Ledoux and Roger Tardiff, all of whom testified in defendant's case in chief. However, Charles Cyr and Raymond Ledoux merely testified to Laverriere's longstanding hatred for the Fredettes. Roger Tardiff testified, as relevant here, that Laverriere belonged to the Eagles Club and that that organization had a longstanding feud with the Fredettes. This testimony does not suggest anything more than Laverriere had hated the Fredettes for a long time. Furthermore, this evidence came after prior statements by Laverriere were admitted into evidence. We have previously stated that prior consistent statements should not be admitted before there has been a suggestion of recent fabrication or improper motive or influence. *State v. Zinck,* 457 A.2d 422, 425 (Me.1983).

9. The instant case should be contrasted with *United States v. Baron,* 602 F.2d 1248, 1253 (7th Cir.), *cert. denied,* 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979). In *Baron,* defendant argued that a written memorandum was improperly admitted under F.R.Evid. 801(d)(1)(B) because the memorandum was part of a plan to inculpate defendant. The Court held that the memorandum was admissible because, among other reasons, the cross-examination implied that the improper motive (self-exculpation) first arose when the declarant was accused of the crime charged. Because the memo was prepared over a year before he was accused, it was admissible as a prior consistent statement. Unlike that case, the cross-examination and other evidence in the instant case only implied that the statements were part of a single plan to inculpate defendant. *See United States v. Quinto,* 582 F.2d 224 (2d Cir.1978).

with the police. Defendant's cross-examination and the other evidence suggests that Laverriere had lied at all times, including the times when he allegedly spoke with Frenette, Lerman and Droggitis. The only charge as to improper motive that fairly arose out of defendant's cross-examination and other evidence was that Laverriere possibly framed Mrs. Fredette to avoid suspicion. Defendant established that Laverriere harbored an ill will against the Fredettes well before October of 1977 and that he knew about the Fredette gun collection from personal experience when he lived with them. In light of the fact that the State had previously attempted to establish on their direct case that the murder weapon was owned by the defendant, this line of cross-examination implied that he possibly could have framed Mrs. Fredette and that he made the statements to Frenette, Lerman and Droggitis in October of 1977 as part of that plan to do so. As such, the prior consistent statements would not operate to rebut defendant's claim that Laverriere had concocted this story as part of a plan to inculpate Mrs. Fredette. Therefore, we agree with defendant that Laverriere had the same motive to lie in October of 1977 as he did at trial and the statements were improperly admitted as prior consistent statements.

We have no hesitation in concluding that this constituted prejudicial error in the circumstances of this case. The State's case was based entirely on circumstantial evidence. A key factual issue in the case was whether or not Mrs. Fredette offered Gus Laverriere money to find someone to kill her husband several months before he was murdered. It was highly prejudicial to erroneously allow three witnesses to testify to prior statements by Laverriere that corroborated his trial testimony. We cannot say that it is highly probable that the erroneous

admission of this hearsay evidence did not affect the jury's verdict. *See State v. Zinck,* 457 A.2d at 426; *State v. True,* 438 A.2d at 467.

We consider it necessary to examine two other claims of error for direction to the Court in the event of a retrial.

### III. *Failure to Object to Nonresponsive Answers by Laverriere at First Trial*

During the course of defense counsel's cross-examination of Mr. Laverriere at the first trial, Laverriere gave several non-responsive answers. In those answers, Laverriere referred to the possibility that the Fredettes were considering a divorce in early 1977. Defense counsel never objected to the answers nor did she move to strike them at the first trial. When counsel for both sides met with the trial justice in his chambers before the reading of Laverriere's cross-examination into evidence at the second trial, defense counsel sought to excude the non-responsive answers made by Laverriere at the first trial. The trial justice at the second trial ruled that defendant could not raise her objection at the second trial because she failed at the first trial to object or to ask the presiding justice to instruct the jury to disregard the non-responsive answers and, therefore, she failed to preserve her objection. On appeal defendant argues this ruling was erroneous.

 The issue presented here is whether objections to parts of former testimony, which could have been asserted when the testimony was initially given, can be made for the first time at the second trial. Although there is a split of authority on this issue,[10] we think that the better view is that objections which go to the form of the testimony must be raised at the initial trial

---

**10.** *E.g., Habig v. Bastian,* 117 Fla. 864, 158 So. 508 (1935) (former testimony open to all objections which might be taken if witness were present); *Calley v. Boston & Maine R.R.,* 93 N.H. 359, 42 A.2d 329 (1945) (former testimony open to all objections which might be taken if

witness were present); *Leach v. Nelson,* 50 N.D. 538, 196 N.W. 755 (1923) (objections not made at first trial cannot be made at second); *see generally* Annot., *Former Testimony Used at Subsequent Trial as Subject to Ordinary Objections and Exceptions,* 159 A.L.R. 119 (1945).

if at all, when testimony is given.[11] *See Sherman Gas & Electric Co. v. Belden,* 103 Tex. 59, 123 S.W. 119 (1909); *McCormick, supra,* at 623. One commentator has stated the principle as follows:

> The more widely approved view, however, is that objections which go merely to the form of the testimony, as on the ground of leading questions, *unresponsiveness,* or opinion, must be made at the original hearing, when they can be corrected, but objections which go to the relevancy or the competency of the evidence may be asserted for the first time when the former testimony is offered at the present trial. (emphasis added).

*McCormick, supra,* at 623. In the instant case, defense counsel's objection at the second trial was made on the grounds of unresponsiveness, not the relevancy or competency of the evidence. Accordingly, we conclude that the presiding justice did not commit error by refusing to exclude portions of Mr. Laverriere's testimony as being non-responsive because no objection had been made when the testimony was originally given.

### IV. *Exclusion of Deposition of Unavailable Witness for Impeachment Purposes*

During this same chambers conference, defense counsel sought a ruling on whether she would be allowed to impeach Laverriere's trial testimony by using a deposition which had been taken before the first trial. After defense counsel made an offer of proof, the presiding justice ruled that the deposition was inadmissible because the subsequent testimony from the first trial was later in time and because defense counsel had an opportunity to use the deposition in the first trial and had not done so.

Rule 15(e) of the Maine Rules of Criminal Procedure governs the use of a deposition at a criminal trial. That rule specifically states "[a]ny deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness." M.R.Crim.P. 15(e). As a general principle, an absentee witness whose testimony is admitted in the form of prior testimony, may be impeached in the same manner as if the witness were present and testifying. *See* 3A J. Wigmore, *supra,* § 888, at 652. We conclude, therefore, that the presiding justice committed error by ruling that the deposition was inadmissible for impeachment purposes.

Because we are vacating the conviction on the other grounds, we need not decide whether the error discussed in part IV constitutes prejudicial error.

Finally, in view of the disposition we make of this case, we consider it unnecessary to discuss the other issues raised on appeal.

The entry is:

Judgment vacated.

Remanded for further proceeding consistent with this opinion.

All concurring.

CARTER, Justice, with whom DUFRESNE, A.R.J., joins, concurring.

I join in the Court's opinion and concur in the result there reached. I have, however, one concern on which I think it necessary to express myself separately from my colleagues.

That concern relates to a doctrinal disagreement I have about the scope of the rule announced in the Court's opinion on the subject of the prior cross-examination of the State's chief witness. (At 24–25.)

---

**11.** This is the rule in both criminal and civil trials when the prior testimony offered at trial is in the form of a deposition. *See* M.R.Crim.P. 15(f); M.R.Civ.P. 32(d)(3)(B). Rule 15(f) of the Maine Rules of Criminal Procedure provides that: "[o]bjections to receiving in evidence a deposition or part thereof may be made as provided in civil actions." As relevant here M.R.Civ.P. 32(d)(3)(B) provides: "Errors and irregularities occurring at the oral examination . . . in the form of the questions or answers . . . are waived unless seasonable objection thereto is made at the taking of the deposition."

The rule applied by the Court's opinion is that on retrial, after a mistrial, the defendant may object on grounds of competency or relevancy to transcribed testimony from the prior trial even though such objections were not lodged to the testimony at the prior trial, but that the defendant is precluded from asserting objections on the ground of unresponsiveness unless such objections were made at the prior trial.

I disagree with *any* restriction placed upon defendant's ability to assert *any* legitimate objection at the second trial because of her failure to make such objection at the prior trial. Such a restriction is inconsistent with the defendant's right to one, complete, fair trial and with the effect of the mistrial. I think it to be indisputable that in a criminal case such as this,

> [t]he declaration of mistrial rendered nugatory *all* of the proceedings during the first trial. The State and defendant were returned to their original position *as if there had not been a trial.* Each was entitled to offer evidence and to make motions and objections without limitation to that which had been offered or made at the first trial and without being bound by the prior rulings of the Court with respect thereto.

*State v. Hale,* 127 N.J.Super. 407, 413, 317 A.2d 731, 734 (1974). (Emphasis added.)

After a mistrial was declared, this defendant was perfectly free to change or to modify her plea for purposes of the second trial, to plead anew any available defenses, to change the factual basis of the defense and, indeed, to change within the strictures of pleading the theory of the defense. A mistrial "means that the [prior] trial itself was a nullity." 317 A.2d at 733. Given the broad flexibility allowed to the defendant in respect to these significant trial functions, I can see no rational justification for, nor any purpose to be accomplished by, attributing any preclusive effect to anything so mundane, by comparison to the breadth of those options, as the conduct of either counsel on examination or cross-examination of witnesses or the court's prior rulings on evidentiary questions at the prior trial.

More importantly, such a preclusive effect results in defendant not receiving a single, comprehensive, fair trial. Rather, the adjudication of her guilt or innocence is based in part upon a trial that has been declared a nullity and in part upon the final proceeding as afflicted by those portions of the prior "non-trial" imported into it. Our concept of the adjudication of criminal guilt is so important and the ideal of fair trial so multifaceted that neither can exist undiminished, in my view, side-by-side with a permitted practice of "patchwork litigation."