**STATE of Maine**

v.

**Dennis THERRIAULT.**

Supreme Judicial Court of Maine.

Argued Sept. 19, 1983.

Decided Dec. 31, 1984.

Janet T. Mills (orally), Dist. Atty., Auburn, for the State.

Berman, Simmons & Goldberg, P.A., William D. Robitzek (orally), Lewiston, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

VIOLETTE, Justice.

Dennis Therriault was convicted of rape, 17–A M.R.S.A. § 252(a)(A) (1983), by a jury after a two day trial held on October 27 and 28, 1982.[1] He appeals from a judgment of conviction entered by the Superior Court, Androscoggin County, on January 6, 1983, and assigns several points of error. Because we find that the presiding justice's refusal to admit in evidence an exculpatory police report offered by defendant constituted prejudicial error, we vacate the judgment of conviction. Although this issue is dispositive of the appeal, we find it necessary to discuss two of defendant's other claims of error: 1) that he was twice put in jeopardy for the same offense, and 2) that he is entitled to specific performance of a plea bargaining agreement he alleges was reached with the prosecutor prior to trial.

I. Facts.

The State's case was presented through the testimony of the victim, the victim's mother and a physician who examined the victim shortly after she complained of the rape. Defendant presented no witnesses, although he did attempt to develop his theory of the case, self-penetration, through cross-examination of the physician and his offer of the laboratory report.

The victim, an eleven year old girl, testified that on the evening of May 10, 1980, she babysat for her next door neighbors, defendant and his wife, in Auburn. At approximately 11:00 p.m. she fell asleep while lying on a mattress that had been placed on the floor in defendant's living room. Shortly thereafter, defendant returned home alone on his motorcycle. He entered the living room and sat down on the mattress next to the girl. When the victim got up to get her shoes, defendant pulled her back on the mattress and began kissing her. The victim testified that defendant unfastened her brassiere and removed her pants and underwear. According to the victim, defendant then penetrated her vagina with his penis three to five times.

At about this time, the victim's mother knocked at defendant's door.[2] Defendant did not respond. After repeated knocking went unanswered, the mother entered the unlocked apartment and observed defendant exit the living room. She found her daughter seated on a chair in the living room in the process of putting on her sneakers. The mother testified that her daughter did not look well and acted peculiar. After being paid for babysitting, the daughter returned home with her mother.

The victim immediately went to the bathroom when she got home. There she discovered blood on her underwear. When she emerged from the bathroom, she asked

---

1. Rape is a Class A crime punishable by imprisonment for a definite period not exceeding 20 years. 17–A M.R.S.A. §§ 252(1)(A) and 1252(2)(A) (1983).

2. From a window in her home, the victim's mother saw defendant arrive at his apartment. After waiting between ten and twenty minutes for her daughter to return home, the victim's mother went next door to get her.

her mother to fasten her brassiere. This request prompted further inquiry from her mother and resulted in the victim telling her mother and father about the rape.

Soon thereafter, the victim was transported to the Central Maine Medical Center in Lewiston where she was examined in the emergency room. The examining physician, John M. James, discovered that the victim had a fresh three or four millimeter laceration of the hymeneal ring. He testified that this finding was consistent with the victim's complaint of a recent rape and, given the history she related to him, he "felt that this girl had been sexually assaulted." The doctor also admitted, however, on cross-examination that the injury could have been self-inflicted. In addition, Dr. James testified that as part of the routine procedure performed at the hospital on persons who complain of rape, he and other hospital staff members took specimens from various parts of the victim's body for testing and comparison with any specimens that might be taken from the body of the accused.

## II. Claim of Double Jeopardy.

Defendant was charged with rape in an indictment dated June 9, 1980. He was first tried before a jury in Superior Court, Androscoggin County, on July 8 and 9, 1981. The trial ended in a mistrial when the jury was unable to reach a verdict after deliberating for several hours. Defendant claims that his re-trial in October 1982, violated his right to be free from double jeopardy. Me. Const. art. I, § 8; U.S. Const. amend. V. We disagree.

The record of defendant's first trial reveals that the jury retired to deliberate at 11:25 a.m. on July 9, 1981. At 5:08 p.m., with the agreement of the prosecutor and defense counsel, the presiding justice sent the following note to the jury:

Mr. Foreman, is there a reasonable expectation that the jury might reach a unanimous verdict if permitted to deliberate longer?

At 5:18 p.m., the jury was returned to the courtroom and the following colloquy ensued:

THE COURT: Mr. Foreman, in response to my inquiry I have a note from you which indicates that you cannot arrive at a unanimous decision, and it appears that no amount of time has changed your jurisdiction [sic]; is that correct?

MR. FOREMAN: That's correct, Your Honor.

The presiding justice then stated that the failure to reach a verdict "indicates manifest difficulties" and discharged the jury. A conference followed in chambers regarding defendant's bail and the restoration of the case on the docket.

■ We note that at no time during these proceedings did defense counsel raise any objection to the manner in which the presiding Justice communicated with the jury and inquired of the foreman in open court on whether the jury was deadlocked or to the Justice's declaration of a mistrial on the basis of manifest necessity. Further, according to an affidavit sworn to by defense counsel, he stated that after defendant's first trial ended in a mistrial and on the same day, he made a plea bargaining agreement with the assistant district attorney who had prosecuted the case. On this record, we conclude that defendant consented to the mistrial and, consequently, cannot now claim he was twice put in jeopardy by his retrial. *State v. Fredette*, 462 A.2d 17, 20 (Me.1983).

## III. Specific Performance of the "Plea Agreement."

Prior to defendant's second trial, defense counsel, on April 28, 1982, filed a motion with the Superior Court entitled "Defendant's Motion for an Order Requiring the State to Specifically Perform According to the Terms of its Negotiated Plea Agreement, or, in the Alternative for an Order Dismissing this Action." An affidavit stated that on July 9, 1981, the day defendant's first trial ended in a hung jury, defense counsel struck a firm plea bargaining

agreement with the assistant district attorney who had prosecuted defendant. The agreement provided that in return for defendant's plea of guilty to a simple assault charge, a Class D offense, the State agreed to dismiss the charge of rape and would recommend a suspended sentence and probation.[3] The affidavit stated further that on March 17, 1982, over nine months after the plea agreement was reached, the district attorney advised defense counsel that the State would not accept a guilty plea to a less severe offense than Gross Sexual Misconduct (Class C) in exchange for a dismissal of the rape charge.[4] Defendant was unwilling to plead to the more serious charge. Although the affidavit states that defense counsel promptly made it known to the district attorney's office that his client wanted to plead to the simple assault "as soon as possible" after the agreement was reached, defendant never entered a guilty plea with the court.

The parties agreed that the motion be decided solely on the basis of defense counsel's affidavit. The motion justice ruled that even if the facts averred in the affidavit were true, defendant was not entitled to specific performance of the plea agreement since he had not pleaded guilty to the reduced charge nor demonstrated that he had relied to his detriment on the assistant district attorney's representations. Defendant argues on appeal that *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), requires specific performance of the unconsummated plea bargain in the instant case.[5] In *Santobello,* the Supreme Court endorsed plea bargaining as an "essential component of the administration of justice" which, if properly administered, "is to be encouraged." *Id.* at 260, 92 S.Ct. at 497–98. The Court's approval was based on a supposition of fairness in securing the plea agreement and the recognition that judicial acceptance of a plea agreement "must be attended by safeguards to insure the defendant what is reasonably due under the circumstances." *Id.* at 261–62, 92 S.Ct. at 498–99.

▪ Any notion that *Santobello* stands as authority for defendant's position, however, was laid to rest in *Mabry v. Johnson,* — U.S. —, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984). In reversing an Eighth Circuit

**3.** Simple assault is punishable by imprisonment for a definite period of less than one year and a fine not exceeding $1,000.00. 17–A M.R.S.A. §§ 207, 1252(2)(D) and 1301(1)(B) (1983).

**4.** Gross Sexual Misconduct (Class C) is punishable by imprisonment for a definite period not exceeding five years and a fine not exceeding $2,500.00. 17–A M.R.S.A. §§ 252, 1252(2)(C) and 1301(1)(A–1) (1983).

**5.** The defendant in *Santobello* was charged with two felony gambling offenses. He initially pleaded "not guilty" to both charges and entered into plea negotiations. The negotiations produced a bargain under which Santobello agreed to plead guilty to a lesser included offense that carried a maximum one year prison sentence in exchange for the prosecutor's commitment to make no recommendation to the court as to the sentence. *Santobello v. New York,* 404 U.S. 257, 258, 92 S.Ct. 495, 497, 30 L.Ed.2d 427 (1971). The prosecutor who negotiated the plea agreement did not attend the defendant's sentencing hearing. Instead, a different prosecutor who was unaware of the prior agreement appeared and, after Santobello pleaded, recommended the maximum sentence. The judge sentenced Santobello to the one year maximum. The defendant immediately objected, claiming prosecutorial breach of the plea bargain. The sentencing judge overruled the objection and in so doing advised Santobello that the prosecutor's recommendation had no bearing on his sentencing decision in light of the defendant's lengthy prior record. *Id.* at 258–60, 92 S.Ct. at 496–98. After unsuccessfully seeking relief on appeal, the defendant obtained *certiorari* from the United States Supreme Court. The Court vacated Santobello's conviction holding that in the "interests of justice" and in "appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty ... when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262, 92 S.Ct. at 499. The Court left to the state court the task of deciding under the circumstances whether the defendant was entitled to withdraw his guilty plea and plead anew to the original charges or whether he was entitled to specific performance of the plea agreement and resentencing by a different judge. *Id.* at 263, 92 S.Ct. at 499.

decision[6] that would have effectively precluded prosecutorial withdrawal of a plea proposal once a defendant's acceptance had been communicated to the prosecutor, the Supreme Court in *Mabry* stated that "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest. It is the ensuing guilty plea that implicates the Constitution." *Id.* — U.S. at ——–——, 104 S.Ct. at 2546. Accepting as true, therefore, the facts stated in the affidavit filed by defendant's attorney in the present case, *Mabry* teaches that defendant had no enforceable right to plead guilty to simple assault in exchange for dismissal of the rape charge. Although the State made such an offer, defendant never pleaded guilty nor in any other way relied on the offer to his detriment.[7] The Superior Court committed no error when it denied defendant's "Motion for Specific Performance."

### IV. The Police Laboratory Report.

During the first trial, defendant's attorney offered a two page report completed at the Maine State Police Crime Laboratory. The report was admitted without objection. It is dated May 14, 1980, and is signed by Maine State Police trooper Marc Anton. Anton died prior to the first trial. The report is typewritten on Maine State Police letterhead and states that it was completed at the request of the City of Auburn Police Department. It reveals that at 11:00 a.m. on May 12, 1980, the crime laboratory received for analysis the bedding on which the victim said the attack occurred, the clothes the victim was wearing at the time of the assault and two "Rape Kits," one from the victim and one from defendant.

The "Rape Kits," consisted of samples taken from the bodies of the victim and defendant including evidence such as fingernail scrapings, hair samples and vaginal, rectal and saliva swabs. The laboratory report lists the types of examinations requested by the Auburn Police Department as follows:

1. Forensic Serology for human semen.
2. Forensic Microscopy of human hairs.
3. Physical examination of clothes for rips and tears.

The report states the examination findings as follows:

1. No traces of semen found to be present on submitted items of evidence.
2. No foreign hairs were present to compare to known samples—no microscopy analysis conducted.
3. No rips and tears noted in victim's clothes.

At defendant's second trial on October 27 and 28, 1982, the State's case was presented by a different prosecutor, the district attorney for Androscoggin County. Defendant also was represented by new counsel. After the jury was empaneled, but prior to opening statement, the district attorney advised defense counsel, in the presiding justice's chambers, that she would not stipulate to the admission of the laboratory report, that she was not planning to offer it as evidence at trial and would object to its admission on grounds of hearsay if offered by defendant. During this discussion, the justice ruled that because the report was admitted at the first trial without objection the State was deemed to have waived any objection based on authenticity. The justice ruled, however, that the State could still object to the report's admissibility at trial on other evidentiary grounds,

---

6. *Johnson v. Mabry*, 707 F.2d 323 (8th Cir.1983).

7. In his brief to this Court, defendant suggests that he acted in reliance on the State's offer, described in the affidavit filed with the Superior Court, for the nine months between the time the offer was made and the time the "less favorable"

offer was communicated to him. Defendant claims that such "reliance" entitles him to specific performance of the initial plea agreement. "Reliance," however, is not demonstrated by the mere passage of time.

such as hearsay. Prior to the taking of any testimony, therefore, defense counsel was fully aware that he would have to establish its admissibility under the Maine Rules of Evidence. Defendant, in fact, offered the report under several theories, all of which were rejected by the trial justice.[8]

Defendant initially offered the report as admission by a party-opponent under M.R. Evid. 801(d)(2). Defendant cited no authority supporting his offer to the presiding justice nor has he cited any supporting authority in his brief to this Court. Rule 801(d)(2) provides:

### RULE 801. DEFINITIONS

....

(d) *Statements which are not hearsay.* A statement is not hearsay if:

....

(2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

■ We note that M.R.Evid. 801(d)(2) is identical to its federal counterpart. Fed.R. Evid. 801(d)(2). Prior to the adoption of the Federal Rules of Evidence, admissions by government employees in criminal cases were viewed as outside the "admission by a party-opponent" exception to the hearsay rule. *United States v. Powers,* 467 F.2d 1089, 1095 (7th Cir.1972); *United States v. Santos,* 372 F.2d 177, 180 (2d Cir.1967). The *Santos* court explained why it is inappropriate to consider a government agent's statement as a party-opponent admission in the context of a criminal prosecution:

> Though a government prosecution is an exemplification of the adversary process, nevertheless, when the Government prosecutes, it prosecutes on behalf of all the people of the [State]; therefore all persons, whether law enforcement agents, government investigators, complaining prosecuting witnesses, or the like, who testify on behalf of the prosecution, and who, because of an employment relation or other personal interest in the outcome of the prosecution, may happen to be inseparably connected with the government side of the adversary process, stand in relation to the [State] and in relation to the defendant no differently from persons unconnected with the effective development of or furtherance of the success of, the prosecution.

*Id.* at 180. We find nothing in the Federal Rules of Evidence nor in Maine's adoption of M.R.Evid. 801(d)(2) suggesting an intent to alter the rule as explained in *Powers* and *Santos. See United States v. Kampiles,* 609 F.2d 1233, 1246 (7th Cir.1979). We hold, therefore, that the laboratory report was not admissible in the present case under any part of M.R.Evid. 801(d)(2).[9]

---

8. Defendant offered the report as an admission of a party-opponent, M.R.Evid. 801(d)(2), as a record of regularly conducted business, M.R. Evid. 803(6), as former testimony, M.R.Evid. 804(b)(1), and as a statement against interest. M.R.Evid. 804(b)(3). Only defendant's offers under Rule 801(d)(2) and 803(6) warrant discussion.

9. We acknowledge that the District of Columbia Circuit has held in one case that when the government adopts a belief in its employee's or agent's statements, the statements are admissible as admissions of a party-opponent under Fed.R.Evid. 801(d)(2)(B). *United States v. Mor-*

*gan,* 581 F.2d 933 (D.C.Cir.1978) *Morgan,* however, presents facts sufficiently distinguishable from the facts of the instant case to preclude application of the "admissions by a party-opponent" rule. In *Morgan,* an informant's statement that "A" was dealing in drugs from a house in Washington, D.C., was incorporated into a sworn affidavit approved by a U.S. attorney and used in the government's application for a search warrant. *Id.* at 935. Upon execution of the warrant, law enforcement officers found "B" at the house and in possession of a small quantity of drugs. "B" was arrested and prosecuted for possession with intent to distrib-

Defendant also offered the report as a record of regularly conducted activity of the Maine State Police Crime Laboratory under M.R.Evid. 803(6), the "business records" exception to the hearsay rule.[10] Again, defendant cited no case authority to the trial justice or to this Court in support of his offer. Other courts have recognized, however, that police reports can qualify as business records and, therefore, are admissible at trial if they meet the requirements of Rule 803(6). *E.g., United States v. Scholle*, 553 F.2d 1109, 1124 (8th Cir.1977) (computer printouts of physical characteristics of illegal drugs seized by authorities admissible in conspiracy prosecution); *United States v. Smith*, 521 F.2d 957, 964 (D.C.Cir.1975) (official police record of reported crime admissible as substantive evidence of date crime was reported); *see Cruz v. State*, 645 S.W.2d 498, 505 (Tex. App.1982) (city toxicologist's report stating substance submitted for analysis to be heroin admissible in prosecution for attempted capital murder and deadly assault on a police officer). The State objected to the admission of the report under this exception on the ground that the preparer of the report was dead, a fact that prevented the prosecutor from testing the accuracy of the report by cross-examination. The State also claimed that the report was untrustworthy, although it suggested no reason why the report was unreliable and nothing on the face of the report suggests that it was altered or amended after it was sent to the Auburn Police Department from the crime laboratory.

There can be no dispute that the laboratory report is hearsay, M.R.Evid. 801(c), and must be excluded unless it qualifies for admission under an exception to the hearsay rule. M.R.Evid. 802. The business records exception provides in its entirety:

RULE 803. HEARSAY EXCEPTIONS: AVAILABILITY OF DECLARANT IMMATERIAL

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(6) *Records of regularly conducted business.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regular conducted business, and if it was the regular practice of that business to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in the paragraph includes business institution, association, profes-

---

ute illegal drugs. At trial "B" attempted to introduce the search warrant into evidence to rebut the claim that he was dealing in drugs and to suggest that, in fact, "A" was the real dealer. The trial court excluded the warrant on hearsay grounds. *Id.* at 936. On appeal, the Circuit Court reversed and remanded the case for a new trial. *Id.* at 939. The court reasoned that where the government authorizes its agent (the U.S. attorney) to present sworn assurances to a judicial officer in order to obtain a search warrant, the statements of fact in the affidavit represent the position of the government itself, not just the government's agent. Such a representation, the court held, constitutes an admission by a party-opponent for the purposes of Rule 801(d)(2)(B). *Id.* at 938. Similar reasoning arguably could be applied to the facts of the instant case to hold the laboratory report admissible. The assistant district attorney's acquies-

cence in stipulating to the admissibility of the report at defendant's first trial could be seen as an admission by the State that the report is a reliable statement of its own for the purpose of applying M.R.Evid. 801(d)(2)(B). We believe, however, that the assistant district attorney's stipulation more reasonably must be viewed as the adoption of a particular trial tactic. To hold otherwise under the facts of this case would be to bind the State to a specific trial strategy and to interfere unreasonably in the State's presentation of the case on retrial. The *Morgan* exception, therefore, is not applicable to the present case.

**10.** The Maine rule is identical in substance and effect to its federal counterpart. Fed.R.Evid. 803(6).

sion, occupation, and calling of every kind, whether or not conducted for profit.

A relevant writing, therefore, qualifies for admission under this exception when (1) the record was made at or near the time of the transaction by a person with knowledge of the event, (2) the record was kept in the regular course of business, (3) the business regularly made such records and (4) the circumstances surrounding the preparation of the record do not indicate a lack of trustworthiness. The party offering the record, defendant in the present case, must produce the custodian of the record, or "other qualified witness," to establish the first three requirements listed above. *State v. Burnham*, 427 A.2d 969, 972 (Me. 1981); *State v. Howard*, 405 A.2d 206, 210 (Me.1979); *see State v. Viger*, 392 A.2d 1080, 1083 (Me.1978); *see generally* 4 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 803(6)[02] (1981 & Supp.1983). Defendant called no such witness. Usually, such an omission would be "fatal to the document's admissibility as a business record." *Howard*, 405 A.2d at 210. Under the particular facts of the instant case, however, defendant's failure to elicit proper foundation testimony from the "custodian or other qualified witness," does not defeat his effort to have the laboratory report admitted.

■ After the State rested its case, defense counsel renewed his motion to admit the report. Counsel's motion took the form of an offer of proof. Counsel stated:

I would indicate to the Court that if the Court were inclined to hear witnesses, I would attempt to show that this falls under the business records exception, that is, that it was a report made at *or near the time by or from information* transmitted by a person with knowledge, and kept in the course of a regular conducted business, and it was the regular practice of that business to make that report as would be shown by the custodian or other qualified witness, custodian

of that report. So, I make the offer of proof.

The presiding justice responded:

I really don't think that an investigative report falls within the meaning, at least generally, of 803(6), and I would—I would allow the offer of proof on the record, but would still sustain the objection of the State as to its admissibility.

. . . .

I assume you could show through the custodian or something that these lab reports are done at the request of either the Attorney General's office or the District Attorney's office, or the State Police investigators or police departments. But I guess what I'm saying is that I don't think that that kind of report is—comes within the meaning of something kept in the course of a regularly conducted business within the meaning of 803(6).

. . . .

The exception of 803(6) is designed to encompass those things that are kind of routinely or regularly kept, and they have a certain amount of trustworthiness whereas I think a report, a diagnosis, of a particular case I don't think has that—carries that kind of routine aspect and that trustworthiness aspect, and, therefore, I don't think it falls within the exception.

I don't think there's any problem with the fact that it's a state agency because I think "business" is very broadly defined, and I would think it would fall within the word "business", but I don't think it's that kind of a diagnosis or report. I think it's admissible only if it's subject to cross-examination.

The justice, therefore, told defense counsel that even if counsel were to call the custodian for the purpose of establishing a proper foundation, the report would not have been admitted because it was an investigative report lacking trustworthiness and because it was not subject to cross-examination. Had the justice not made this ruling, defense counsel would have called the custodian of the records or other qualified

witness to establish a proper foundation for admission under Rule 803(6). Accordingly, we cannot hold that defendant's attempt to introduce the report must fail because of inadequate foundation testimony.

Initially, we emphasize the atypical posture of the evidentiary issue presented for review. The present case is not one in which the State is offering an incriminating police report as part of its case in chief in lieu of the direct testimony of the arresting or investigating officer. We are not concerned, therefore, with constitutional considerations regarding a criminal defendant's right to confront and cross-examine his accusers. Me. Const. art. I, § 6; U.S. Const. amend. VI. Instead, we are faced with the highly unusual case where a defendant seeks to have a report that was prepared by a law enforcement officer admitted under the business records exception, to rebut the State's case against him.[11]

The justice clearly stated that the laboratory report was not admissible under Rule 803(6) because it was an investigative report or a "diagnosis of a particular case" that lacked trustworthiness. According to the justice, the report was admissible only if it were subject to cross-examination. The justice's ruling was a preliminary determination of the admissibility of the report under M.R.Evid. 104(a).[12] We may vacate the judgment of conviction in the present case only if the ruling was erroneous and a substantial right of defendant was affected by the ruling. M.R.Evid. 103(a)(2).[13]

 The test for admissibility of a laboratory report under Rule 803(6) focuses on the knowledge of the person making the report, the contemporaneousness of the making of the report with the observance of the facts being reported, the "regularity" of the recording and keeping of the report and the report's trustworthiness. The presiding justice labeled the laboratory report in the present case "investigative" and, as such, ruled that it could not qualify for admission under Rule 803(6). The test for admissibility under Rule 803(6), however, does not concern the "investigative" or "non-investigative" nature of the report being offered. The fact that Trooper Anton's report was "investigative" in the sense that it was completed at the request of a local police department and concerned the investigation of possible criminal activity in a particular case does not per se remove the report from the business records exception. The justice erred when he concluded that an "investigative" report could not qualify for admission under Rule 803(6).

 The justice also concluded that the report was untrustworthy. Lack of trustworthiness is a proper ground for excluding from evidence an otherwise quali-

---

11. After an extensive analysis of many cases decided under the business records exception, the District of Columbia Circuit Court of Appeals articulated the following rule: Police reports are normally excluded when offered by the party at whose request or on whose behalf they were made but should ordinarily be admitted *"when offered by a criminal defendant to support his defense."* United States v. Smith, 521 F.2d 957, 965, 967 (D.C.Cir.1975) (emphasis in original). At least one other court has followed this rule when confronted with this issue although it found the error committed by the trial court in excluding the police report offered by the defendant to be harmless. *State v. Bertul,* 664 P.2d 1181, 1185–86 (Utah 1983).

12. Rule 104(a) provides in pertinent part:

Rule 104. PRELIMINARY QUESTIONS

(a) Questions of admissibility generally. Preliminary questions concerning the qualifi-

cation of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, . . . .

13. Rule 103(a)(2) provides:

Rule 103. RULINGS ON EVIDENCE

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .

(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

fied business record. The record on appeal, however, reveals no basis for such a conclusion. Commonly, a "lack of trustworthiness" finding is predicated on a finding that the record was altered after it left the control of the preparer or custodian of the report, *see, e.g., United States v. Oates,* 560 F.2d 45, 65, 75 (2d Cir.1977), or that the preparer had some motivation to misrepresent or misstate results contained in the report, *see, e.g. Palmer v. Hoffman,* 318 U.S. 109, 113–14, 63 S.Ct. 477, 480–81, 87 L.Ed. 645 (1943), or that the report was prepared in anticipation of litigation. *See, e.g., id.* at 114, 63 S.Ct. at 480–81; *United States v. Williams,* 661 F.2d 528, 531 (5th Cir.1981); *Gilmour v. Strescon Industries, Inc.,* 66 F.R.D. 146, 150 (E.D.Pa.), *aff'd mem.,* 521 F.2d 1398 (3d Cir.1975).

◼ There is no indication that Anton's laboratory report was altered after he completed it. Its authenticity was not disputed at trial. In addition, we perceive no basis for any claim that Anton was improperly motivated to produce a report containing no inculpatory findings. Further, even if we concede that the report was prepared in anticipation of litigation, it was not offered by the party on whose behalf the report was made. The "prepared in anticipation of litigation" argument carries no weight when the report is offered by the party who did not request that the report be made. *United States v. Smith,* 521 F.2d 957, 967 (D.C.Cir.1975); *see Battee v. State,* 543 S.W.2d 91, 92 (Tex.Crim.App. 1976).

Finally, "[t]here are circumstantial guarantees of trustworthiness in a record contemporaneously prepared by one who acts under a business duty of care and accuracy particularly when the business entity for which the record is made relies on it."

*United States v. Licavoli,* 604 F.2d 613, 622 (9th Cir.1979); *see State v. Cosgrove,* 181 Conn. 562, 574–578, 436 A.2d 33, 40–41 (1980). Trooper Anton's report is dated two days after he received the "rape kits" from the Auburn Police Department. It cannot be disputed that Anton was under a business duty to report his findings accurately in order to preserve his job and the integrity of the state crime laboratory. Law enforcement agencies rely daily on laboratory reports to assist in the apprehension and prosecution of those suspected of criminal activity. There is nothing in Anton's report, and the State has cited no facts of record, suggesting that Anton deviated from his duty to test the submitted items of evidence properly and to communicate his findings accurately to the Auburn Police Department.

◼ In addition to his "lack of trustworthiness" finding, the justice stated later, after defendant's offer, that if Anton's report were admissible at all, it would be so only if it were subject to cross-examination.[14] We note initially that Rule 803(6), by its terms, does not predicate the admission of a business record on the ability of the opposing party to cross-examine the preparer of the record. Rule 803(6) applies to all cases where the admissibility of a business record is at issue, regardless of whether the declarant is available. Moreover, the State, unlike a criminal defendant, enjoys no right of confrontation under the constitutions of Maine or the United States. Me. Const. art. I, § 6; U.S. Const. amend. VI.[15] The State's inability to cross-examine the preparer of the report offered in the present case is of no consequence to the report's admissibility under the business records exception.[16] The justice erred

---

**14.** Obviously, since Anton was dead at the time of trial, the court's conditioning the admissibility of the report on the State's ability to cross-examine Anton, effectively cut off defendant's attempt to gain admission of the report under Rule 803(6).

**15.** Such a constitutional concern would preclude admission of the evidence if offered by

the State even if the report otherwise satisfied the requirements of Rule 803(6). M.R.Evid. 402; *see* Field & Murray, *Maine Evidence* § 402.1 at 57 (1976).

**16.** Of course, in the presumably more common case, the preparer of the report would be alive and, therefore, "available" for cross-examina-

in concluding that Anton's report was inadmissible because of the State's inability to cross-examine.

On the facts of this case, therefore, it was error for the presiding justice to have ruled that the laboratory report was inadmissible under the business records exception to the hearsay rule.[17] We cannot conclude on the present record that it is highly probable that the error did not affect the judgment.[18] *State v. Rytky*, 476 A.2d 1152 at 1155, slip op. at 6 (Me. 1984); *see State v. True*, 438 A.2d 460, 467 (Me.1981). Accordingly, we must vacate defendant's conviction.

Although defendant produced no witnesses nor testified on his own behalf, he attempted to develop his theory of self-penetration in his cross-examination of the examining physician and in his offer of the laboratory report. The laboratory report states that no traces of semen were found on the submitted items of evidence [19] and that no foreign hairs were present to compare to the known samples taken from the victim and defendant.[20] It cannot be disputed, therefore, that Anton's report states no findings that support the rape charge.

Although not dispositive of the issue of defendant's guilt or innocence, the report is consistent with defendant's self-penetration theory and tends to exculpate defendant. Specifically, the report's finding that no semen was present on the evidence submitted for analysis contradicts an emergency room report properly admitted at trial wherein an emergency room nurse reported that the victim's assailant "apparently did ejaculate." In addition, although the

tion by the State upon the service of a subpoena pursuant to M.R.Crim.P. 17(a).

17. The State argued at trial and in its brief to this Court that the public records and reports exception to the hearsay rule, M.R.Evid. 803(8), states an obvious and specific policy against making investigative and other police reports admissible. Without deciding whether the State's view of the scope of Rule 803(8) is valid in a case where a criminal defendant offers a police report at trial, we note that, in general, merely because evidence is not admissible under one exception to the hearsay rule, exclusion is not mandated if it is admissible under some other exception. *United States v. Smith*, 521 F.2d 957, 964 (D.C.Cir.1975), citing C. McCormick, *Evidence* § 286 at 603 n. 12 & § 290 at 611.

18. Although not determinative of our holding, we do not deem it insignificant that at defendant's first trial, the report was admitted and the trial ended in a hung jury; whereas, at defendant's second trial, the report was excluded and defendant was convicted. *See State v. Crocker*, 435 A.2d 1109, 1111 (Me.1981).

19. The report stated that the crime laboratory received the following evidence:
 Victim's Rape Kit:
 K–1, empty blood tube
 Q–1, A.P. tab
 Q–2, fingernail scrapings right hand
 Q–3, fingernail scrapings left hand
 K–2, head hairs
 K–3, pubic hairs
 Q–4, misc. container (not used)
 Q–5, pubic combings (no hairs)
 Q–6, vaginal smear # 1
 Q–7, vaginal smear # 2
 Q–8, control swab # 1
 Q–9, rectal swab
 Q–10, vaginal swab # 1
 Q–11, saliva swab
 Q–12, control swab # 2
 Q–13, vaginal swab # 1
 Suspect's Kit: (DENNIS THERRIAULT)
 Q–14, A.P. tab (not used)
 Q–15, fingernail scrapings right hand
 Q–16, fingernail scrapings left hand
 Q–17, pubic combings (no hairs)
 Q–18, control swab
 Q–19, saliva swab
 Q–20, rectal swab
 K–4, pubic hair
 K–5, head hair
 Bedding:
 Q–21, pillow case
 Q–22, yellow bedspread
 Q–23, blanket
 Q–24, fitted sheet
 Victim's Clothes:
 K–6, pair blue socks
 K–7, Van Heusen yellow sweater
 K–8, white long sleeve sweater
 K–9, white bra
 K–10, green J.C. Penny size 14 jeans
 K–11, white with pink and blue flowers pair panties

20. The report also states that no rips or tears were found in the victim's clothes. Because no evidence was introduced at trial suggesting a struggle, we deem this finding neither inculpatory nor exculpatory.

jury heard testimony from the examining physician that "samples" from the bodies of the victim and alleged assailant are taken as a matter of course in rape investigations, and that such samples were taken from the victim in the present case, the fact that tests were completed on the samples taken from both the victim and defendant and the results of such tests were kept from the jury because of the justice's refusal to admit the laboratory report. In seeking admission of the report, defendant was attempting merely to show that the tests completed at the request of the Auburn Police Department in no way corroborated the victim's testimony nor lent support to Dr. James' opinion testimony relating to the cause of the hymeneal tear. Although the report does not establish defendant's innocence, it does constitute evidence that tends to support defendant's claim that he did not commit the rape. We conclude that the error committed by the presiding justice in refusing to admit the report was prejudicial.[21] Because of our disposition of the case, we find it unnecessary to reach defendant's other claims of error.

The entry is:

Judgment vacated.

Remanded for further proceedings consistent with the opinion herein.

McKUSICK, C.J., and ROBERTS, and GLASSMAN, JJ., concurring.

WATHEN, Justice, with whom NICHOLS and SCOLNIK, JJ., join, dissenting.

I respectfully dissent from the Court's holding that the presiding justice erred in ruling that the investigative laboratory report was inadmissible under the business records exception to the hearsay rule. At trial defendant advanced four theories in support of the admissibility of the report. He argued alternatively that it was either a record of a regularly conducted business, former testimony, a statement against interest, or the admission of a party opponent. In his brief, defendant argues only the last two theories and cites no authority in support of either position. This Court correctly disposes of the arguments raised in the brief but then resurrects the business records argument offered at trial. In my judgment the investigative report at issue in this case is not admissible as either a public record or as a business record.

We have not previously addressed the interrelationship between the hearsay exceptions for public records, M.R.Evid. 803(8), and business records, M.R.Evid. 803(6). Although the two rules may overlap to some extent, it is apparent that the rules are neither coextensive in rationale nor scope. Rule 803(6) premises reliability on the systematic, businesslike way in which records are kept as part of a regularly conducted business. Rule 803(8) relies less on regularity and recognizes the inherent impartiality and reliability of records made by public officials. The business records exception is directed toward documents generated as a regular practice in the course of a regularly conducted business. The public records exception, on the other hand, refers to reports of "regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law." Unlike the business records provision, Rule 803(8) contains no requirement of contemporaneousness nor does it require foundation testimony by the custodian. Significantly, Rule 803(8) specifically excludes "investigative reports by police and other law enforcement personnel." The opinion in *United States v. Oates*, 560 F.2d 45 (2d Cir.1977) is instructive with respect

---

**21.** Even though it does not affect this judgment, we grant the State's motion to strike certain portions of the appendix defendant filed in the Law Court. Defendant improperly included in the appendix parts of the transcript of his first trial, M.R.Crim.P. 39(b), and a copy of a Superior Court opinion defendant cited as support for his double jeopardy argument. M.R.Crim.P. 39B(a)(6).

to the relationship between the federal equivalent to Rule 803(8) and the remaining hearsay exceptions. In *Oates,* the prosecution offered, and the trial court admitted as a business record, the official report and worksheet of the United States Customs Service chemist who analyzed a white powdery substance seized from the defendant. The Second Circuit read into the federal business records provision an implied exception for investigative reports and reversed the evidentiary ruling of the trial court. *See id.* at 78.[1]

It is beyond dispute that the record involved in the present case is not admissible as a public record. This Court, however, on the basis of a conclusory offer of proof, treats the investigative report as a business record and disregards the language of Rule 803(8). It is clear that unless this Court accepts the interrelation between the two rules provisions, the specific exception for investigative reports in Rule 803(8) will become a virtual nullity. If an investigative report is admissible as a business record, the rule would authorize its admission when offered by the state as well as the defendant. If such a result occurs, the potentially alarming aspects of the rules would be realized rather than avoided. *See* Field and Murray, *Maine Evidence* § 803.8 at 219.

I would decline to accept the report as a business record. In the present case the presiding justice committed no error in excluding the investigative report. I would affirm the conviction.

SCOLNIK, Justice, dissenting.

Although I agree with the dissenting opinion of Wathen, J. that the laboratory report was inadmissible under M.R.Evid. 803(6), it is my opinion that the judgment should be vacated and an order entered dismissing the indictment because of a violation of the defendant's right not to be twice placed in jeopardy.

The court's opinion gives short shrift to the issue of double jeopardy. It does not consider whether the trial justice acted within his discretion in declaring a mistrial at the defendant's first trial. Instead it finds that the defendant consented to the mistrial, and thus waived his right not to be retried. This record shows neither manifest necessity for, nor the defendant's consent to, a mistrial.

There is no question that "the trial court may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial." *Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978). It is also clear that the trial court has "broad discretion in deciding whether or not 'manifest necessity'" for a mistrial, *viz.,* a *genuinely* deadlocked jury, exists in a particular case. *Id.; State v. McConvey,* 459 A.2d 562, 566 (Me.1983). But the court's discretion is not unbounded. It may be exercised only within the parameters of the policy governing the defendant's "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington,* 434 U.S. at 509, 98 S.Ct. at 832. Specifically, the court's discretion is limited to ensuring that the verdict ultimately rendered derives from the "considered judgment of all the jurors," and not from other "pressures inherent in the situation." *Id.* A reviewing court is required to show deference to the trial court's determination that a jury could not have reached a verdict with more deliberation only as long as the trial court acted within those boundaries. *Id.* at 510, n. 28, 98 S.Ct. at 832–33, n. 28; *State v. Linscott,* 416 A.2d 255, 260 (Me.1980).

Because of the importance of the defendant's right to be free from double jeopardy, "the trial justice has a duty to assure himself that the jury is *genuinely* deadlocked

---

1. The *Oates* court held on the basis of federal legislative history that an investigative report "cannot satisfy standards of any hearsay exception if those reports are sought to be introduced against the accused." *Id.* at 84. M.R.Evid. 803(8) and the official commentary does not distinguish between evidence offered by the state or the defendant.

before declaring a mistrial...." *State v. Mahaney,* 437 A.2d 613, 619, n. 4 (Me.1981) (emphasis added). This Court has listed standards that it deems relevant to the trial court's decision. *See State v. McConvey,* 459 A.2d at 566–67; *State v. Linscott,* 416 A.2d at 260. These standards are objective factors that enable the Law Court to assess whether the trial court properly exercised its discretion. No single factor, except that the jury be allowed adequate time for deliberation, is mandatory, but, taken together, they have the force of "guidelines" that the trial court may not disregard. *See State v. McConvey,* 459 A.2d at 566–67; *State v. Commeau,* 438 A.2d 454, 456 (Me. 1981); *State v. Henderson,* 435 A.2d 1106, 1108 (Me.1981); *State v. Linscott,* 416 A.2d at 260. The Law Court's evaluation of the trial courts' decisions under these guidelines was determinative in those four cases. *See also State v. Fredette,* 462 A.2d 17, 20 (Me.1983) (alternative holding).

We require that the trial justice allow the jury adequate time for deliberation (which may in part depend on the length of the trial), and suggest that he inquire of the foreman whether there exists a reasonable probability of a unanimous verdict. Beyond that we have looked to the extent of the disagreement reported, the number of communications from the jury indicating a deadlock, whether the judge gave the jurors additional instructions to aid in breaking the impasse, the number of times the judge sent the jurors back for more deliberation, whether he questioned each juror about the probability of a verdict, and whether the defense counsel was given the opportunity to participate in the decision to declare a mistrial.

After a two-day trial, the court in this case dismissed the jury after four and one half hours of deliberation. Unlike *Linscott, Henderson, Commeau, McConvey,* and *Fredette,* the jury in this case did not on its own initiative communicate to the trial court that it could not agree. The only communications from the jury requested a "readback" of certain testimony

and the repetition of the reasonable doubt instruction. With the consent of counsel, the trial justice originated a written inquiry about the probability of agreement that was delivered to the jury. It was not in response to any message from the jury. Once they were in the court room, the justice neither gave the jurors additional instructions regarding their duty to reach a verdict (as in *Henderson, Commeau,* and *Fredette* ), nor returned them to the jury room after their first indication of inability to agree (as in *Henderson, Commeau, McConvey,* and *Fredette* ). The justice did not question each juror individually (as in *Commeau* and *McConvey,* and suggested by *Linscott* ), nor did he solicit defense counsel's participation in the decision to declare the jury "genuinely deadlocked." (*See Linscott* and *McConvey.*)

There was, in short, nothing in this record on which the trial court could have based a conclusion that the jury, if required to deliberate longer, would have decided on the basis of improper considerations. Indeed, this court has approved the use of the A.B.A. approved instructions regarding the jurors' duty to consult with one another with a view to reaching a verdict because, "the jury should not be permitted to avoid a reasonable period of deliberations merely by repeated indications that it is unable to agree." *State v. Mahaney,* 437 A.2d at 618, quoting from the 1968 Commentary to the A.B.A. Standards Relating to the Administration of Criminal Justice, *Trial by Jury,* § 5.4. That this jury did not initiate the communication regarding deadlock is highly significant in assessing whether they were "suffering [in] mind or body." *Arizona v. Washington,* 434 U.S. at 510, n. 27, 98 S.Ct. at 832, n. 27 (quoting from *Regina v. Charlesworth,* 1 B. & S. 460, 504, 121 Eng.Rep. 786, 802 (Q.B.1861)).

Before this court can conclude that the defendant has not been subjected to double jeopardy, it must find that the trial court properly exercised its discretion under the *Linscott* standards. The factors indicating manifest necessity for a mistrial must af-

firmatively appear in the record. In this case the record discloses no basis on which the trial court could have decided that the public interest in fair judgments had been infringed. It thus abused its discretion in declaring a mistrial.

Nor is it constitutionally permissible to hold in this case that the defendant waived his right to claim double jeopardy by failing to object to the mistrial. While that would be the correct result if the defendant had *consented (United States v. Dinitz*, 424 U.S. 600, 606–08, 96 S.Ct. 1075, 1079–80, 47 L.Ed.2d 267 (1976); *State v. McConvey*, 459 A.2d at 566, n. 2), the transcript discloses no affirmative agreement to the mistrial.

The court relies on *State v. Fredette*, 462 A.2d 17, but the facts in *Fredette* are clearly distinguishable. In *Fredette*,

> The trial justice sought the views of defense counsel, and defense counsel actively participated in the decision whether to grant a mistrial. At the point when the trial justice decided he would discharge the jury if they felt they could not reach a verdict, he made this known to defense counsel who offered no objection.

*Id.* at 20. The record in the present case discloses no such active participation by counsel in the mistrial decision. Unlike *Fredette*, the court did not advise counsel in advance that it would declare a mistrial if the jury indicated no reasonable probability of reaching a verdict. This court's opinion states only that the defense counsel did not object. The question here is not whether a defendant has failed to preserve an error for appellate review. It is whether he has waived his right not to be twice put in jeopardy by failing affirmatively to protect it.

It is true that a defendant may be retried after a mistrial without a knowing, voluntary, and intelligent waiver of his right to be free from double jeopardy. *United States v. Dinitz*, 424 U.S. at 609, n. 11, 96 S.Ct. at 1080–81, n. 11. However, this is because "the protection against the burden of multiple prosecutions underlying the constitutional prohibition against double jeopardy" is satisfied when manifest necessity exists to declare a mistrial. *Id.* Where, as in this case, there has been no proper finding of manifest necessity for a mistrial, the reason for holding an affirmative waiver unnecessary disappears. The defendant here did not consent to the mistrial. His right not to be twice put in jeopardy is too important for this court, *sua sponte* in review, to find as a fact that the defendant manifested his consent by his silence.

That the defendant continued to engage in plea bargaining after the mistrial lends no support to this court's finding of consent. While a negotiated guilty *plea* may constitute a waiver of a defendant's right to trial and related constitutional privileges (*e.g. Shorette v. State*, 402 A.2d 450, 459 (Me.1979)), the mere participation in negotiations on the day following his first trial was in no way inconsistent with his assertion of double jeopardy, and does not support a finding of consent to mistrial or waiver of his right not to be twice placed in jeopardy.

Accordingly, I conclude that, without even minimal compliance with the *Linscott* standards, there was insufficient basis for the trial justice to find that the jury was genuinely deadlocked. Without manifest necessity to do so, it was an abuse of discretion to declare a mistrial. I would vacate the judgment and enter an order dismissing the indictment.